Jerry Jackson **LEE, D.O.,** Plaintiff,

v.

**HOSPITAL AUTHORITY OF COLQUITT COUNTY d/b/a Colquitt Regional Medical Center,** Defendant.

No. CIV.A. 6:02–CV–73(HL).

United States District Court, M.D. Georgia, Thomasville Division.

April 15, 2004.

Christopher Lee Casey, Julian Hue Henry, Athens, for Jerry Jackson Lee, II D.O., Plaintiff.

James Conner Whelchel, Moultrie, for Hospital Authority, Defendant.

## OPINION

LAWSON, District Judge.

This case is before the Court on the motion of Defendant Hospital Authority of Colquitt County ("the Hospital") for summary judgment. Alleging diversity of citizenship jurisdiction, and pursuant to Georgia law, Plaintiff Jerry Jackson Lee ("Dr. Lee") seeks injunctive relief and damages for the Hospital's alleged failure to follow its bylaws concerning the extension of medical staff privileges. Upon due consideration of the arguments of counsel, the relevant legal authorities, and the evidence presented by the parties, and as set forth more fully below, the Court finds that there are no genuine issues of material fact, and that the Defendant is entitled to

judgment as a matter of law. Accordingly, Defendant's motion for summary judgment is **GRANTED**.

## I. FACTUAL BACKGROUND

Upon completion of his residency in July of 1997, Dr. Jerry Lee moved to the Moultrie, Georgia, area to begin his practice as a physician specializing in obstetrics and gynecology. He applied for and obtained privileges as a member of the medical staff at the Colquitt Regional Medical Center in Moultrie. In addition, he obtained staff privileges at Baptist Hospital in Worth County. After a one-year probationary period and two years as a fully privileged member of the staff at the Hospital in Moultrie, Dr. Lee was required to renew his application for privileges, as the Hospital requires all physicians to do every two years. Dr. Lee submitted his application for reappointment on December 13, 2000.

Certain representations made in Dr. Lee's re-application documents led to the initiation of an investigation by the Hospital's Medical Executive Committee. The forms for re-application provided by the Hospital require the applicant to disclose any prior suspensions of privileges or disciplinary action at any hospital. Question 3–E of the application asks, "Have your privileges at any hospital ever been suspended, diminished, revoked, or not renewed?" Question 3–G of the application asks, "Have you ever been denied appointment, clinical privileges, renewal thereof or been subject to disciplinary action by any medical or hospital organization?" Dr. Lee answered both of these questions in the negative. His answers aroused the suspicions of Dr. D.W. Adcock, a retired physician employed as the hospital's Medical Director, who initially reviewed his application.

Dr. Adcock was aware of an incident that had occurred at Baptist Hospital in Worth County, related to Dr. Lee's per-forming a hysterectomy on a woman who was pregnant at the time. This incident was well-known in the community and had been the subject of a story or stories in the Albany, Georgia newspaper. Dr. Adcock recalled that Dr. Lee had received some type of discipline for this incident. In order to confirm his recollection and to investigate further, Dr. Adcock wrote a letter dated January 25, 2001 to Dr. Naru Patel, the chief of staff at Baptist Hospital. Dr. Adcock also sought further information from Dr. Lee. In a letter dated January 24, 2001, Dr. Adcock requested that Dr. Lee meet with him on January 31 "to discuss a staff matter." Plaintiff's Exhibit 17. At that meeting, Dr. Lee confirmed that he had performed a hysterectomy on a pregnant patient and that he had been suspended for a period of several days. He explained that the medical staff at Baptist Hospital had told him the incident was a "non-event" and that he need not mention the matter in his application for reappointment. Additionally, in a follow-up letter dated February 26, 2001, Dr. Lee stated that he had been placed on a temporary suspension during the investigation of the incident, but explained that the suspension had been "rescinded." Plaintiff's Exhibit 18. He suggested in his letter that Dr. Patel had reviewed all of his pre-surgical charts for a period of one year, although he did not use the word "probation."

Dr. Patel responded to Dr. Adcock's January 25 letter with a letter dated February 27, 2001. In his letter, Dr. Patel describes his hospital's response to the incident involving the hysterectomy as follows:

In May of 1999, Dr. Lee's clinical privileges were summarily suspended based on his care and treatment of a patient at Baptist Hospital Worth County. His suspension was lifted after a three-week period with the understanding that peer

1258

review activities, as well as a quality assurance review, were ongoing.

In July of 1999, Dr. Lee was placed on probation for a period of twelve months with mandatory consultation and proctoring of his GYN surgical cases. During this time, I was responsible for consulting with Dr. Lee and approving all of his GYN surgical cases prior to surgery. I also conducted a prospective review of all of his surgical cases during this year. Dr. Lee's probationary period ended in July of 2000 with the expectation that he will continue to institute and follow practices and procedures standard within his specialty and in line with his delineation of privileges.

Plaintiff's Exhibit 19.

After receiving Dr. Patel's letter, Dr. Adcock wrote to Dr. Lee in a letter dated February 28, 2001. In his letter, Dr. Adcock notes the inconsistency between Dr. Lee's and Dr. Patel's descriptions of the response to hysterectomy incident, and states that "it would seem to my eye that there has been misrepresentation in your application for reappointment to the Medical Staff." Plaintiff's Exhibit 20. The letter further states Dr. Adcock's intent to refer the matter to the Chief of Staff and to the Chief Executive Officer.

The issue of Dr. Lee's application for reappointment was raised at a meeting of the Hospital's Medical Executive Committee on April 16, 2001. The Medical Executive Committee is a committee organized under the bylaws of the Hospital that is primarily responsible for the appointment or reappointment of members of the medical staff and for quality assurance in the administration of medical services. The Chief of Staff presides over the Committee of ten additional physicians, as prescribed by the bylaws. At Section 5.1(A), the bylaws also provide that certain specified administrative officers of the Hospital will be non-voting members, including the CEO. At the time of the April 16 meeting, Dr. Clyde Lamon was the Chief of Staff. Upon hearing Dr. Adcock's report, the Medical Executive committee decided to form an ad-hoc committee to investigate the matter. Dr. Lamon chose the members of the committee, who included Dr. Lamon, Dr. Terrence Croyle, Dr. Patricia June, Dr. Howard Melton, Dr. Ronald Trescot, Dr. Adcock, and Mr. Lowry. On April 20, 2001, Dr. Lamon sent a letter to Dr. Lee informing him that the Executive Committee had chosen to postpone his application for reappointment and requesting him to schedule a meeting with the committee within 30 days.

Some time shortly after the ad-hoc committee was appointed to investigate Dr. Lee's application, concerns arose regarding Dr. Lee's rate of complications in the treatment of his patients. The Hospital employed a nurse, Cathy Smith (also known as Cathy Rowell), as its quality assurance coordinator. Her job was to monitor all reports of complications occurring during treatment in the Hospital and to review the charts for those procedures to look for the causes of the complications. In the case of Dr. Lee, Ms. Smith received five reports of complications, an incidence of complications considered outside the norm. She reported her concerns to the Medical Executive Committee at a May 10, 2001 meeting, and the Medical Executive Committee assigned the already-formed ad-hoc committee to investigate the complications. The ad-hoc committee then decided to refer the charts to an outside consultant for review. After review of the charts, the consultant, Dr. Barry Wolk of Augusta, Georgia, issued a written summary of his findings on May 29, 2001, and participated in a telephone conference with members of the ad-hoc committee in June. Dr. Wolk expressed concern that Dr. Lee's frequency of surgical complications was outside the range of statistical probability.

He also concluded that Dr. Lee's descriptions of the patients' abdominal cavities seemed unlikely and appeared to be "used as justification for questionable surgical skills/judgement." Plaintiff's Exhibit 6, p. 3.

The ad-hoc committee next attempted to schedule a meeting with Dr. Lee to discuss their concerns regarding his application responses and his rate of complications, and to give him an opportunity to respond. In a memo dated June 29, 2001, Dr. Lamon gave notice of a meeting scheduled for July 16, 2001. The copy of the notice provided as Plaintiff's Exhibit 7 displays a hand-written notation that it had been rescheduled to July 31. A subsequent memo dated July 10, 2001 confirms the rescheduling. Both written memoranda regarding the July 16th meeting are addressed to the "Ad-hoc Committee" and list Dr. Lee, Dr. Croyle, Dr. Melton, Dr. Trescot, Dr. Adcock, and Mr. Lowry as addressees. In their subject lines, the memoranda state simply "Meeting—Ferguson Board Room," and provide no further information as to the nature of the meeting.

Based upon these memoranda, Dr. Lee contends that he did not receive notice of the investigation of his application for reappointment or of his surgical complications. In addition to the memoranda, however, there is substantial undisputed evidence to indicate that Dr. Lee was actually aware of the investigation and of the nature of the committee's concerns. As noted above, he received written notice from Dr. Adcock that the matter of his application responses would be brought to the attention of the Medical Executive Committee. He also received the April 20, 2001 letter from Dr. Lamon regarding the postponement of his application for reappointment and requesting a meeting. Furthermore, members of the ad-hoc committee have testified that Dr. Lee discussed the investigation with them personally. Dr. Melton has testified that Dr. Lee approached him in the surgery lounge and asked him why the committee was looking into his record of complications in surgical cases, and that he had a similar discussion concerning the ad-hoc committee's work on a second occasion, shortly before Dr. Lee's resignation from the staff. Dr. Lamon has testified that Dr. Lee approached him and reviewed his conversation with Dr. Melton. In that conversation with Dr. Lamon, Dr. Lee expressed concern that the investigation was threatening his livelihood. In the middle of his conversation with Dr. Lamon, Dr. Lee left the room and returned some time later to say, "I just found out that if I resign, that Howard said that would put an end to the [investigation]." Lamon Dep., pp. 16–17. There is no evidence to dispute this testimony.[1]

Ultimately, Dr. Lee did resign from the Hospital's medical staff. Several days before his scheduled July 31, 2001 meeting with the ad-hoc committee, Dr. Lee approached Mr. Lowry in Mr. Lowry's office and stated that he intended to resign. He asked if he would still be required to attend the meeting if he resigned. Mr. Lowry told him that he would not. Dr. Lee then asked that Mr. Lowry write a letter for him stating that his privileges had not been altered, suspended, or revoked. Mr. Lowry agreed to do so, and produced the letter. On July 16, 2001, Dr. Lee wrote to Mr. Lowry to provide formal notice of his desire to resign effective July 31, 2001 in order to leave the Moultrie area and establish a practice in Augusta. His resignation was accepted.

When Dr. Lee resigned, the ad-hoc committee halted its investigation and canceled the scheduled meeting with Dr. Lee. At an August meeting, the Medical Executive Committee determined that it was obligat-

1. There is no deposition or affidavit of Dr. Lee in the record before the Court.

ed to make a report of the investigation to the National Practitioner Database ("NPDB"). The NPDB is a reporting agency established by Congress to "restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101. In an October 5, 2001 letter, Dr. Lamon notified the Georgia Medical board that Dr. Lee "was being investigated by an ad-hoc committee regarding patient quality of care issues at the time of his resignation from the Medical Staff of the Colquitt Regional Medical Center." Plaintiff's Ex. 15. The letter further explains that "[t]he investigation was not complete, it has been discontinued, and no conclusions were reached." *Id.* A report was subsequently placed on the NPDB noting that Dr. Lee voluntarily surrendered his clinical privileges "while under, or to avoid, investigation relating to professional competence or conduct." Complaint, Ex. D, p. 12. In further description of the action taken, the NPDB report restates the language from the Hospital's letter to the Georgia Medical Board, explaining that the investigation was incomplete and that no conclusions had been reached.

## II. ANALYSIS

Pursuant to the Georgia Code at O.C.G.A. § 51–1–6, Dr. Lee claims that the Hospital breached a legal duty to him by failing to follow its existing by-laws in the investigation of the questions regarding his application for reappointment and his surgical complications, and that he has suffered damage as a result. His alleged damages stem from the report to the NPDB, which he contends has caused him "to be unable to secure staff privileges and practice medicine at other institutions, including the hospital with which [he] had contracted in the Augusta area and even outside the State of Georgia, in Mississip-

pi, where [he] presently resides." Complaint, ¶ 13. Courts in Georgia have recognized that a physician has a cause of action in tort where a hospital abridges or refuses to follow its existing bylaws concerning staff privileges and the physician is damaged thereby. *St. Mary's Hospital of Athens, Inc. v. Radiology Professional Corp.*, 205 Ga.App. 121, 421 S.E.2d 731, 736–37 (1992).

■ Plaintiff has failed in this case to meet his burden of setting forth sufficient evidence to create a genuine issue of material fact with regard to his claim that the Hospital breached its duties to him as provided in the Bylaws. In addition, he has failed to show that the Hospital's report to the NPDB was knowingly false. The undisputed evidence in the record before the Court establishes as a matter of law that the Hospital's actions in the investigation of Dr. Lee's application and of his surgical complications were consistent with its Bylaws. Article VI of the Hospital's Bylaws, under the heading "Practitioner's Rights," provides that

Any physician has a right to a hearing/appeal pursuant to the institution's fair hearing plan in the event any of the following actions are taken or recommended:

1. denial of initial staff appointment.

2. denial of reappointment.

3. revocation of staff appointment.

4. denial or restriction of requested clinical privileges.

5. reduction in clinical privileges.

6. revocation of clinical privileges.

7. individual application, or individual changes in, mandatory consultation requirement.

8. suspension of staff appointment or clinical privileges if such suspension is for more than 14 days.

Affidavit of Christopher L. Casey, Ex. A, pp. 15–16. There is no evidence or contention that any of these circumstances applied to Dr. Lee in this case. At the time of his resignation, the investigation into his conduct was still proceeding and no decision or recommendation had been made with regard to the denial, revocation, or suspension of his privileges. At the time he left the Hospital, Dr. Lee was still a fully credentialed and privileged member of the medical staff, as Mr. Lowry's letter "to whom it may concern" attests.

■ Although no event occurred to trigger his right to the fair hearing process, Dr. Lee contends that the Hospital failed to follow the procedures of the Medical Staff Credentialing Manual, which is attached as Chapter Two to the Hospital's bylaws, with respect to the consideration of his application for reappointment and with respect to the investigation of his surgical complications. Provisions for the review of applications for reappointment are found in Article II of the Credentialing Manual. Dr. Lee cites Section 2.5 related to the review of a completed application. That provision requires that the application be reviewed by the Chief of Clinical Service, the Chief of the section for which the applicant seeks privileges, the Medical Executive Committee, and the Medical Staff. Section 2.5 is inapplicable in this case, however, because Dr. Lee's application was not a "completed application" as defined in Article II. Section 2.3 states that "Processing of the application cannot begin until all required information is on file and validated." One required item, as provided in Section 2.1(C), is "Information as to whether the applicant's professional license or medical staff appointment or clinical privileges at another hospital have ever been reduced, revoked, suspended, not renewed, or voluntarily relinquished." Section 2.2(C) requires that an applicant authorize "hospital representatives to obtain validation of information supplied in support of the application."

Before his resignation, Dr. Lee's application for reappointment was never a "completed application," because the information he provided related to prior suspensions of clinical privileges was in question and required verification. There is nothing in the Bylaws or the Credentialing Manual that requires the verification of information on an application to be conducted by a member of the medical staff or any other specified person. The provision merely states that "hospital representatives" were authorized to seek validation of any information provided in the application. Dr. Adcock, as the Hospital's medical director, was a representative of the hospital so authorized. The information he found was by itself enough to call into question the accuracy or truthfulness of Dr. Lee's responses. Nothing in the Bylaws can be read to prevent the Medical Executive Committee from being exceedingly cautious and appointing a committee of its own members and Dr. Adcock to make further inquiry before acting on the matter.

Even if the application had been complete and ready for review, the evidence indicates that the Medical Executive Committee substantially complied with the requirements of Section 2.5. Section 2.5 requires that the completed application be "reviewed by the chief of the clinical service, with input from the Section Chief to which the applicant would be assigned." The application was in fact reviewed by the Chief of Clinical Service, Dr. Lamon, who was a member of the ad-hoc committee, as well as chairman of the Medical Executive Committee. The Section Chief for the obstetrics and gynecology section, Dr. David Adcock, II, was not appointed to the ad-hoc committee because of a perceived conflict of interest related to a dis-

pute over Dr. Lee's decision not to join Dr. Adcock's practice.[2] He was replaced by obstetrician Dr. Ronald Trescot. There is no negative provision in the Bylaws to suggest that the Chief of Clinical Service and the Section Chief cannot solicit the help of others in their initial review. Following the initial review, the Bylaws require the Medical Executive Committee to act on the application within 90 days. In this case, the Committee was unable to do so within that time period because of the new concerns that arose related to Dr. Lee's surgical complications.

 Dr. Lee contends that the investigation of his surgical complications was also conducted in contradiction to the Bylaws. Article VI of the Credentialing Manual governs questions of marginal practice by members of the medical staff. In Section 4.1, the Manual describes the obligations of the medical staff:

Whenever reliable information reflects a pattern of practice, or even a single incident of care, that could seriously and adversely affect patients, the medical staff, the hospital or its employees, and if the information or incident relates to a medical staff member's clinical judgement or skills ... then it is the medical staff's obligation to deal with the situation in a timely manner.

Such medical staff action may be stimulated by information developed through routine quality assurance activities, by a complaint from a medical staff member, patient, or hospital employee, or by a request from the governing body, medical staff leadership, or chief executive officer.

Section 4.2 outlines a procedure for informal problem resolution. That provision declares its intent "that its implementation include discussions with the involved prac-

titioner." It then describes the procedures for resolution as follows:

A. One member of the Executive Committee is assigned by the Chief of Staff to pursue the matter and report back to the Executive Committee.

B. The assigned member alerts the hospital legal counsel, either directly or through the Chief of the Medical Staff or the Chief Executive Officer, that a suspected problem with a member of the medical staff must be pursued. The assigned staff member, with the assistance of the clinical chief **or anyone else**, is assigned the responsibility of interviewing supporting personnel, collecting and displaying objective data that confirms or disproves the suspected problem exists.

C. If the objective information, according to the assigned staff member, fails to confirm the suspected problem, then that person reports back to the Medical Staff Executive Committee and the Medical Staff Executive Committee votes to end or continue the fact finding.

D. If the collection and display of objective information from all available sources confirms the existence of the suspected problem, then the assigned member meets with the involved practitioner, the practitioner's clinical service chief, and a remedy is recommended. The assigned member and the Chief of the Service report to the Executive Committee and obtain their approval for the remedy and recommended plan of action.

E. If the remedy and recommended plan cannot be agreed upon by the Executive Committee, the practitioner is granted a hearing before the Executive Committee within five working days.

---

**2.** D.W. Adcock is the son of the Hospital's medical director.

F. If a remedy cannot be achieved by the Executive Committee and the practitioner, the practitioner's recourse is the Fair Hearing Plan.

(Emphasis added). The undisputed evidence in the record of this case shows that up to the point that Dr. Lee resigned from the Hospital, the investigation proceeded according to the informal problem resolution procedures. The investigation was stimulated by information developed through routine quality assurance activities, and had no apparent connection with the already-initiated investigation of Dr. Lee's application. While it is true that the Chief of Staff, Dr. Lamon, appointed more than one member of the Medical Staff to pursue the matter and report back to the Executive Committee, the rules permit the investigating staff member to have the assistance of "anyone else," including a committee of other members of the Medical Staff or even someone from outside the Medical Staff, such as the Hospital's Medical Director. Primarily it is significant that at least one member of the Medical Staff was responsible for the investigation. It appears from the evidence that Dr. Lamon himself directed the ad-hoc committee's investigation. It was not a denial of Dr. Lee's rights that several other members of the staff were involved.

As outlined in the procedures, the ad-hoc committee assembled the objective data regarding Dr. Lee's complications and reviewed them. It also submitted this data to an outside consultant to ensure a disinterested review. Once the committee had the conclusions of the consultant, along with its own conclusions, all of which indicated a rate of complications above the expected statistical norm, it attempted to schedule a meeting with Dr. Lee. The By-laws require that the investigating staff member must give notice to and meet with the involved practitioner only after it has conducted some investigation and reached a preliminary conclusion. There is no requirement that the practitioner have notice throughout the period of the investigation. Dr. Lee decided to resign before his meeting with the committee could take place.

In any event, it is also clear and undisputed in the record that Dr. Lee did have actual notice that a committee was investigating both his application and his complications. Dr. Adcock gave him written notice on January 25, 2001 that the concerns related to his application responses would be presented to the Executive Committee. Dr. Lamon's April 20, 2001 letter provided further notice that the committee was investigating his application. Dr. Lee's own statements, as attested by Dr. Melton and Dr. Lamon and uncontradicted by any evidence from Dr. Lee, make plain that Dr. Lee was aware of the existence of the ad-hoc committee and the nature of its investigation into his surgical complications. Dr. Lee asked Dr. Melton why questions had been raised regarding his complications, and attempted to defend his actions. Dr. Lee also spoke with Dr. Lamon and suggested that his resignation from the staff might bring an end to the investigation. Dr. Lee also made the same suggestion to Mr. Lowry, and requested that Mr. Lowry write a letter affirming that his privileges had not been altered, suspended, or revoked. Dr. Lee's notice of the investigation is also indicated by his requests to postpone the July 16, 2001 meeting to July 31. On July 16, 2001, Dr. Lee gave Mr. Lowry written notice that he intended to resign his practice effective July 31. In light of this uncontradicted evidence, it is unreasonable for Dr. Lee now to argue that he had no notice of the investigation or its subject matter merely because two memoranda regarding the scheduled meeting do not describe the purpose of the meeting.

Citing to a statement in the testimony of Dr. Melton, Dr. Lee contends that the ad-

hoc committee had already made a final decision regarding the disposition of the matter before its scheduled meeting with Dr. Lee. This statement is read out of context. In its context, this statement indicates that the ad-hoc committee was proceeding in a manner consistent with the Bylaws. Dr. Melton testified: "By my memory, I believe the recommendation was to go back to the medical executive committee per the recommendation of [the consultant] to set up some type of monitoring or review of Dr. Lee's complications for some period of time." Melton Dep., p. 28. This statement only indicates that the committee had reached a conclusion that the suspected problem did in fact exist and had formulated a proposed recommendation to remedy the problem, as it was required to do under Section 4.2(D) of the Credentialing Manual. Only after such a conclusion is reached do the Bylaws require a meeting with the practitioner to discuss the recommendation and formulate a final proposal for the Medical Executive Committee. Dr. Melton's later testimony confirms that the ad-hoc committee intended to go forward with this next step, but were unable to do so because of Dr. Lee's postponements and ultimate resignation. On the next page of the deposition transcript is Dr. Melton's testimony that the committee "had a meeting scheduled with Dr. Lee to go over the findings of the ad hoc committee, and it was postponed and rescheduled." Melton Dep., p. 29. Dr. Melton went on to clarify that the "findings" of the committee to be discussed at that meeting included its proposed recommendation. Due to Dr. Lee's decision to resign, that meeting never took place. Up to the point of Dr. Lee's resignation, the ad-hoc committee had acted according to the procedures outlined in the Bylaws.

■ Finally, in the penultimate paragraph of his brief in response to the motion for summary judgment, Dr. Lee raises the allegation that Dr. Melton violated the Bylaws' confidentiality provisions when he spoke with his wife about Dr. Lee's case. This fact first became known through Dr. Melton's deposition testimony. In the course of explaining the process by which the Executive Committee decided to report Dr. Lee's resignation to the NPDB, Dr. Melton revealed that his wife had discussed the matter with a doctor at another hospital, who had suggested that Dr. Lee's resignation was a reportable event under the HCQIA. It was apparently Dr. Melton who then raised the question to the Executive Committee as to whether the Hospital was obligated to report Dr. Lee's resignation. The Hospital's Credentialing Manual provides at Section 5.1 that

Information regarding medical staff activities and the activities of individual medical staff members collected and used voluntarily by the medical staff for the purpose of maintaining an improving the quality, cost, or accessibility of patient care in the hospital shall be kept confidential by medical staff members, governing body, administration, and hospital personnel to the fullest extent permitted by law.

Although the evidence supports a conclusion that Dr. Melton violated the confidentiality provision of the Bylaws by speaking with his wife, the Hospital is nevertheless entitled to summary judgment on this claim, as on all other claims, in that the only damages claimed as a result of this breach stem from the Hospital's report to the NPDB. The relief Dr. Lee seeks is prohibited by the Federal statutes concerning professional peer review activities.

■ In his Complaint, Dr. Lee seeks compensation for damages resulting from the report made to the NPDB and injunctive relief ordering the removal of the report. He alleges that the NPDB report has made him unable to obtain professional privileges in Georgia or Mississippi. Although Dr. Lee has disclaimed any legal

theories under the HCQIA or Georgia libel law, all of his alleged damages stem from the report and its consequences on his attempts to obtain privileges at other hospitals. Because the investigation was terminated before any action was taken by the Hospital, he cannot claim damages for the deprivation of his privileges. At the time he resigned, he was still a fully credentialed and privileged member of the Medical Staff, and there had been no decision to change that status. He had not been disciplined or suspended. It appears from the testimony of Dr. Melton cited above that the ad-hoc committee was not even inclined to recommend a suspension or denial of privileges, but only a period of monitoring, as had been done in Worth County.

The federal statutes that establish the NPDB provide that "[n]o person or entity ... shall be held liable under **any civil action** with respect to any report made under this subchapter ... without knowledge of the falsity of the information contained in the report." 42 U.S.C. § 11137(c) (emphasis added). This protection from liability, by the breadth of its terms, extends to civil actions brought under state tort law, where the damages claimed are solely the result of a report to the NPDB. The Hospital's report concerning Dr. Lee was appropriate pursuant to 42 U.S.C. § 11133(1), which *requires* the Hospital to report to the NPDB whenever it "accepts the surrender of clinical privileges of a physician ... while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct." It is clear from the evidence in this case that Dr. Lee was under such an investigation and that the Hospital accepted the surrender of his clinical privileges while that investigation was still under way. The Hospital was careful to note in its report that no conclusions had been reached in the investigation, and that no actions had been taken or recommended as a result. Regardless of whether the Hospital followed the letter of its Bylaws in carrying out its investigation, its report to the NPDB is indisputably true. Under the law it had no choice but to make that report, and cannot now be sued for doing so.

## III. CONCLUSION

Defendant Hospital Authority of Colquitt County has demonstrated that Plaintiff Dr. Jerry Jackson Lee has failed to create a genuine issue of material fact with regard to each element of his claims. The undisputed evidence shows that the investigation of Dr. Lee's application for reappointment and of his surgical complications was conducted in a manner consistent with the Hospital's Bylaws. In addition, there is no evidence to show that the Hospital knowingly made a false report to the NPDB regarding Dr. Lee's resignation. All evidence in the record indicates that the Hospital's report was accurate. Accordingly, the Hospital is entitled to judgment as a matter of law, and the motion for summary judgment is hereby **GRANTED.**